## TRAFIKATIEDOLAGET GRANGESBERG OXELOSAND v. AINES-WORTH COAL & IRON CO.

### (District Court, D. Maryland.   June 9, 1921.)

### No. 707.

1. **Shipping �köö38—Breach of bunkering provision by owner does not entitle charterer to cancel.**

   Under the rule that when mutual covenants go only to a part, where the breach may be paid for in damages, they cannot be pleaded as a condition precedent, the breach by an owner of a provision in a charter party for the transportation of a cargo of coal giving the charterer the right to bunker the vessel does not authorize the charterer to cancel the charter party, but merely entitles it to recover damages for the breach of that provision.

2. **Shipping ⊚ⱼ58(3)—Charterer can recover for breach of bunkering clause loss on coal and expenses of preparing it for ship.**

   A charterer can recover from the vessel owner, as damages for breach of the clause in the charter party giving the charterer the right to bunker the vessel, not only the difference between the market price of the coal which the vessel would necessarily have had to put in her bunkers for the voyage and the market price at time of resale of such coal, but also any expenses in preparing the coal for delivery to the ship which would not add to its market value on resale.

3. **Shipping ⊚ⱼ58(2)—Evidence held not to show breach by owner of bunkering agreement.**

   On a libel for cancellation of a charter party, in which the charterer filed a cross-libel for breach of the bunkering clause by the owner, evidence of written communications and telephone conversations between the agents of the parties *held* to show that, after the vessel had been bunkered through a misunderstanding of the charter provisions, the owner offered to purchase the bunker coal from the charterer or to discharge that in the vessel's bunkers, and to take on that of the charterer before the time for cancellation of the charter party, so that there was no breach of the bunkering agreement.

In Admiralty.  Libel by the Trafikatiedolaget Grangesberg Oxelosand against the Ainesworth Coal & Iron Company to recover damages for the cancellation of a charter party, to which the respondent filed a cross-libel for breach of the charter party.  Decree for libelant on the original libel, and cross-libel dismissed.

Brown, Marshall, Brune & Parker, of Baltimore, Md., for libelant.

George Forbes and John Phelps, both of Baltimore, Md., for respondents.

ROSE, District Judge.  Each of the parties is a corporation—the libelant of Sweden; the respondent of this country.  The former chartered its steamship Narvik to the latter, to carry 6,500 tons of coal, 10 per cent. more or less, at $15 per ton, from Baltimore, Norfolk, or Philadelphia, to a Scandinavian port.  Had the charter been carried out, the freight earned would have been somewhere between $87,750 and $107,250.  The parties will be referred to as the owner and the charterer, respectively.

⊚ⱼFor other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The charter was negotiated on behalf of the owner by New York brokers, in accordance with cable instructions given them, to the effect, among other things, that it was to be upon the clear Washington form, the sixteenth article of which says:

"Bunker coal required, to be supplied by charterers at loading port, at current rates."

It appears, however, that there had been another Washington form, which said nothing about bunkering. It so happened that it was this earlier form the owner had by it, and was the one it intended its brokers to use, and which it supposed had in fact been executed. Accordingly it arranged to have the ship bunkered by a concern which had for some time done its Atlantic Coast bunkering. Apparently, when the instructions to provide the bunkers were given, the owner did not know that the charterer had designated a port at which the Narvik was to load, if in fact it had then done so, and the owner thought it probable that Philadelphia would be the one selected. As the ship was to deliver cargo in Baltimore, and as it was desired that she should be there dry-docked, the owner directed that bunkering was, if possible, to go on simultaneously with discharging, so that immediately after the ship came out of the dry dock, she would be ready to go to Philadelphia. Therefore, so soon as she reached Baltimore, on the 15th of October, bunkering began, and was completed the next day, an aggregate of a trifle over 915 tons being put on board.

No copy of the charter as actually signed reached her master or her agents in Baltimore until some days later. It chanced that, in drawing up the charter as actually executed, some clerical errors had been made. Apparently they were not noticed until October 20th, when the owner's brokers called them to the attention of the charterer, and at the same time suggested that perhaps the charterer was not interested in the bunkering, and, if so, there might be an amendment in that respect also. It is probable that, when this letter was written, the owner's brokers knew that the ship had been bunkered, although there is no direct evidence on the subject. It is certain that, if they did, they did not mention it to the charterer. On the 21st the latter accepted the other suggested corrections, but declined to assent to an elimination of the bunkering provision. On Saturday, October 23d, at 9:45 a. m., the ship reported herself ready for cargo.

On Monday, the 25th, the charterer learned that the ship had been bunkered, and, after taking legal advice, sent telegrams to the ship's agents in Baltimore, and to the owner's brokers in New York, that the ship had "breached the charter under clause 16; consider the steamer canceled by us, holding owners for all damages," and at the same time wired instructions to its own agents in Baltimore to give the same notice to the ship's agents by letter. The ship's agents received the telegram at 3:40 in the afternoon of the 25th. Within 20 minutes, they had the charterer on the telephone. As about the only disputed facts in this case are as to what passed over the telephone between the charterer and the ship's agents, it will be convenient to postpone the discussion of the evidence concerning the telephonic conversations

until the story of what each of the parties put into writing has been first told.

On the 25th, after the telephone conversation of the ship's agents and the charterer, and consequently at a late hour in the afternoon, the ship's agents cabled the owner in Sweden that the charterer had canceled the charter absolutely and irrevocably, claiming breach because owner had supplied bunkers; that the agent, subject to the owner's approval, had offered that the steamer take sufficient from them to reach destination, approximately 400 tons; that the agents refused cancellation; that they were consulting solicitors, and asked that instructions be wired immediately. The owner in reply, by a cable received here on the morning of the 27th, directed that the bunkers in the ship be discharged; that they be stowed for another of the owner's steamers due some weeks later; that the agents should claim fulfillment of charter, and take from charterer 800 to 1,000 tons at current rates. It also called attention to the fact that the charter could not be canceled before November 10th, that being the cancellation date named in it.

Immediately upon receipt of this message, the ship's agents wired the charterer that its action in canceling charter party was without justification, and that the steamer stood ready to perform all terms of the charter party, including section 16, and asked that the charterer telegraph immediately whether it would perform or repudiate. To this the charterer replied, by telegram received about 2:25 on the same day, the 27th, to the effect that the agreement to comply with the charter party was received too late; that it was loading another steamer, and would hold the owner responsible for its loss. The agents answered that neither the owner, nor her agents, nor any other authorized person, had ever refused to recognize charterer's rights under article 16, and again demanded performance.

On the morning of the 26th, the owner's brokers in New York, in answer to the telegram of cancellation on the 25th, wired the charterer:

"Referring your telegram impossible arrange bunkering Narvik. We will agree that you bunker steamer Western King provided you waive whatever rights you may have bunkering Narvik Baltimore."

In a letter to the charterer, written the next day, the senders of the above telegram explained that they understood from charterer's telegram of cancellation that the charterer had found it impossible to arrange for bunkering of Narvik, and, if by chance that was true, the brokers were willing to purchase from the charterer, bunkers for the steamer Western King at Philadelphia. They added, however, that they thought that, upon referring to the ship's agents at Baltimore, the charterer would find there was probably no objection to the Narvik taking bunkers from the charterer.

To complete the tale, there remains only the telephonic conversations. According to the ship's agents, there were but two of these, both on the 25th, the first about 1 p. m., on the call of the charterer, and the second at the instance of the agents, immediately after they had received the telegram announcing the charterer's decision to cancel. The charterer thinks there were more than one on each of the

three days, the 25th, the 26th, and the 27th. The records of the telephone company confirm the accuracy of the testimony of the ship's agents on this point, and apparently demonstrate that the recollection of the charterer's president, then its vice president, cannot be depended upon. It should be said that this gentleman acted for the charterer throughout, and for the purpose of this controversy he was it.

It is impossible from his testimony to get any clear idea as to what took place at each telephonic conversation, and what were the chronological order of the various propositions that were made by the two sides, or indeed as to precisely what those propositions were. He felt himself aggrieved, and apparently he thought that the person who spoke from the agents' office at times used a high-handed tone.

Accepting, as I must, the story of the telephonic conversations told by the witness who conducted them for the ship's agents, what happened was this:

About 1 o'clock in the afternoon of the 25th, the charterer called up the ship's agents, and said that it understood that the Narvik had been bunkered, and that it intended to cancel the charter, to which the witness replied that he did not know the facts, but that, if the ship had been improperly bunkered, any loss the charterer had suffered thereby would be made good. The charterer answered that that would not be satisfactory. About 3:40 the telegram of cancellation came in. The agents then called to their office their admiralty counsel, now one of the proctors in this case, and under his advice called up the charterer. The agents said that the owner would stand by the charter. This statement is denied by the charterer, but is confirmed by the proctor, who is not only absolutely reliable, but who paid special attention as to what his client was saying, and appreciated accurately the legal situation in which the parties were. I am satisfied that then and there an unequivocal offer to perform was made.

The charterer's version is that all the agents were willing to do was to let it supply 100 tons of bunker coal. It is true that there was some conversation as to the amount of coal which the charterer thought it was entitled to furnish, and upon this point there was room for difference of opinion. The ship was bound to take from the charterer only so much as it needed, and that might have varied from a matter of 100 tons or so to her full capacity of some 1,200, depending upon whether her bunkers had been filled on the other side, just before she sailed for this country; whether her owner wanted her to take on board coal enough for the round trip, and so on. As she had on board upwards of 200 tons when she reached Baltimore, a matter of 400 tons would have carried her to the other side.

From the cablegram which the ship's agents sent to the owners immediately after the conversation in question, it is probable that they offered to receive from the charterer that amount. That was, perhaps, all the charterer could have demanded, although, when the owner answered, it went further and offered to take on board a quantity which, when added to that in the ship's bunkers when she reached Baltimore, was all they could hold.

I am satisfied that the purpose of the ship's agents in their telephonic conversation with the charterer on the afternoon of the 25th was to make sure that nothing that the charterer had a right to ask should be withheld from it. The gentleman acting for the charterer was quite incensed at what he had come to believe was an unfair attempt to put something over on his company, and he heard then, and remembers now, everything from the standpoint of a man who thought and believed somebody was trying to cheat him. He says, however, that he did not want the bunkers which had been put into the ship taken out, in order that he might put the same kind of coal back. He entirely agreed with the court that such a proceeding would have been in the last degree absurd, and he says that all he wanted was to have the coal the charterer had provided for the ship's bunkers taken off its hands at the current rates. I do not think that he ever made this proposition to the ship's agents in such a clear way that they understood it, or, if he did, he coupled it with a demand that they should take from it 1,200 tons, which was nearly 300 more than he had a right to ask. He testified that he did not feel free to sell his bunker coal until the morning of the 28th, for until that time the other charter was not off. The charterer remained firm in its refusal to accept the ship, and after some days' delay a new charter was procured for a voyage to Dunkirk at $10 a ton. The owner has instituted these proceedings to recover the resulting damages, and the charterer has made a counterclaim for the loss which it alleges the failure of the ship to permit it to supply the bunkers, caused it.

Upon this state of facts, two questions are presented: (1) Would a breach by the owner of the bunkering provision of the charter party have justified a cancellation by the charterer? (2) Was there any breach in fact?

[1, 2] For a century and a half, Lord Mansfield's statement of the governing principle has remained unchallenged:

"Where mutual covenants go to the whole of the consideration on both sides, they are mutual conditions, the one precedent to the other; but when they go only to a part where a breach may be paid for in damages, there the defendant has a remedy on his covenant and shall not plead it as a condition precedent." Boone v. Eyre, 1 H. Bl. 273; Kauffman v. Raeder, 108 Fed. 171, 47 C. C. A. 278, 54 L. R. A. 247.

In one sense, at least, there can be no question that article 16 is a separable and independent undertaking. The charterer was to furnish the bunker coals, and was to be paid for them at the current rate. Such a bargain is complete in itself, and might be made by the ship with any one other than the charterer, or by any dealer in bunker coals with any ship, whether he had, or proposed to have, any other relations with her or not. Apparently this breach can be adequately compensated for in damages. If the owner fails to perform in this respect, the charterer is entitled to recover what he lost by not being allowed to furnish the coals, and that is all the charterer says it at the time wanted. If the charterer acts as promptly as in this case it claimed the right to do, the loss on the resale of the coals would not ordinarily be a serious matter, for as it was to furnish them to the ship at the current rate—that is

to say, at the market—presumably it could usually get the same price, or nearly the same price, from some one else.

There might, however, under some circumstances be other elements for which the charterer would be entitled to compensation, as for any outlay to which it had reasonably gone in getting the coals ready for delivery to the ship, and which would not add to their value to others. In such expense might perhaps be included any decline in their price between the time in which the ship should have accepted them and the time in which with reasonable diligence they could have been resold. If it was the charterer who failed to perform his bunkering obligations, the loss might easily be greater and the consequences more serious. If the sailing of the ship was thereby delayed, the charterer would have to pay what her use for the time was worth, whether as determined by the charter party or proved in other ways. It is, of course, true that there may be cases in which the obligation of the charterer to furnish coal, provisions, wage money, and generally to finance a ship goes to the very root of the agreement between the parties, or to change the figure is the foundation upon which they build their bargain. When that is so, the failure of the charterer to supply the funds, if the owner is not able to furnish them himself, may well entitle the latter to treat the charter as at an end. The Alida (C. C.) 12 Fed. 343.

But the relation between the parties now at the bar is not of such a character, nor is there anything in the evidence to show that there was anything peculiar about the bunkering provision in this case. The charterer was in the coal business and wanted to sell the bunker coal and make a profit from doing so, which he estimates would have been about $2.80 a ton or between $2,500 and $2,600 in all. Its president frankly testified on the stand that he did not care who supplied the coal which went into the ship's bunkers, provided he was able to sell to the owner the quantity which was needed for them. It must be borne in mind that there was no obligation on the ship to take any particular quantity of coal, and that which the charterer could have demanded put on board might have been very small. Upon the facts here shown, it would be scarcely possible to treat the refusal of the ship to permit the charterer to furnish the bunkers as a justification for the rescission of the contract, even had such refusal been definite and binding.

[3] 2. But, from what has been already stated, it is obvious that there was no such clear-cut refusal. There was apparently a misunderstanding, as the result of which, the ship was bunkered by the owner. There was at the most 48 hours' delay on the part of the agents in finding out whether or not the owner was willing to have these coals removed. Just so soon as it could be communicated with, and had the chance to reply, it unqualifiedly assented to the charterer's contention. It was not too late for it to do so. There was still two weeks before the expiration of the steamer's canceling date.

It follows that the owner is entitled to recover what loss it suffered by the unjustifiable cancellation, and that the cross-libel of the charterer must be dismissed.