### TRAFIKATIEDOLAGET GRANGESBERG OXELOSAND v. AINESWORTH COAL & IRON CO.

(District Court, D. Maryland. May 31, 1922.)

No. 707.

1. Shipping ⟨⬤⟩58(3)—Where it is impossible to secure other employment on charterer's failure to load ship, owner is entitled to damages for loss of time for only such period as is necessary to put ballast on board.

Where charterer fails to furnish a cargo as required by the charter, and where it is manifestly impossible to secure other employment for the ship, the owner is required to start the ship back empty to her home port as soon, after it receives the charterer's definite refusal to load her, as suffi-

⟨⬤⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cient ballast can be put on board, and the owner in such case is entitled, as damages in addition to the full freight called for by the charter plus the cost of the ballast, merely for loss of such time as is necessary, after the owner receives the charterer's definite refusal to load the ship, to put the ballast on board.

2. Damages ⬚⟹62(4)—Owner required to minimize damages by securing another charter, on charterer's failure to furnish cargo.

Where charterer fails to furnish a cargo as required by the charter, it is the owner's duty to minimize the damage by securing another charter, if it is possible to do so.

3. Shipping ⬚⟹58(3)—Owner who secures other charter for same voyage at same rate of freight, after original charterer fails to furnish cargo, entitled as damages merely to loss of time caused by ship's delay in departure from port.

If charterer fails to furnish cargo as required by the charter, and it is possible to obtain another charter for the same voyage at the same rate of freight, the owner can recover as damages merely the loss of the ship's time for the period during which the refusal of original charterer to load had delayed the ship's departure from the port.

4. Shipping ⬚⟹58(3)—Charterer, who fails to furnish cargo, credited with earnings under recharter, and charged with value of time lost in delay in departure of ship.

Where charterer failed to furnish a cargo as required by the charter, and the owner obtained another charter for a different voyage and at a different rate, the original charterer will be credited with all the owner's earnings under the recharter on freight due owner, and will be charged with the value of the time by which, in consequence of the refusal of the charterer to load, the ship's departure from the port was delayed.

5. Shipping ⬚⟹58(2)—Agreement as to demurrage presumptive evidence of value of use of ship, in fixing damage for delay in departure.

Agreement between shipowner and charterer as to what demurrage should be paid is at least presumptive evidence of what the use of the ship was worth, in fixing damage for loss of time because of delay in departure of ship, on charterer's failure to furnish cargo and rechartering of vessel to third party.

In Admiralty. Libel by the Trafikatiedolaget Grangesberg Oxelosand, a corporation under the laws of the kingdom of Sweden, against the Ainesworth Coal & Iron Company. Decree for libelant.

Charles R. Hickox, of Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, and R. E. Lee Marshall, of Brown, Marshall, Brune & Parker, of Baltimore, Md., for libelant.

George Forbes and John Phelps, both of Baltimore, Md., for respondent.

ROSE, District Judge. [1] In an opinion heretofore handed down (273 Fed. 215) the charterer was held liable for the damage suffered by the owner in consequence of the former's failure to furnish a cargo as required by the charter. In ascertaining the amount, the circumstances seem to make it expedient to restate some commonplace principles. Had it been manifestly impossible to have secured other employment for the ship, it would doubtless have been the owner's duty to start her back empty to her home port so soon, after it had received the charterer's definite refusal to load her, as sufficient ballast could be gotten on her. As by the expiration of the lay days it knew that the charterer had repudiated its agreement, there would, under the conditions supposed, have been no claim for any other loss of time than that which might have been necessary to put her ballast on board,

but, on the other hand, the charterer would have been bound to pay the owner the full freight called for by the charter, plus the cost of the ballast.

By the charter, the ship was to take 6,600 tons of coal, 10 per cent. more or less. On the voyage made under the recharter, to be presently mentioned, she in fact carried 6,445 tons, and in all subsequent calculations it will be assumed that she would have taken that number for the charterer, had the latter permitted her to do so. The charter rate was $15 per ton, so that the freight which would have been earned under it would have been $96,670. It is probable that the cost of getting ballast and having it put on board, and the loss of time thereby incurred, would have run the total bill up to at least $100,000, if not more, for all of which the charterer would have been liable.

[2, 3] But it was, of course, the owner's duty to minimize the damage by securing another charter, if it could. Had it been possible to obtain one for the same voyage and at the same rate of freight as that which the charterer refused to perform, the damage the breach would have occasioned the owner would have been the loss of the ship's time for the period during which the refusal of the charterer to load had delayed the ship's departure from this port. She did get another charter, although, as will be seen, not either at the same rate or to the same port. Nevertheless the portion of the loss resulting from keeping her longer than she would have been is not affected by that circumstance. What loss of time was there? She reported herself ready for loading at 9:45 on the morning of October 23. By the terms of the charter lay days were to begin 48 hours thereafter; that is, at 9:45 a. m. on Monday, October 25. There was nothing which happened to postpone their running, for, as more fully stated in the former opinion, I am satisfied that the filling of her bunkers by the owner did not justify the charterer in rescinding. By the terms of the charter she was to load 1,500 tons a day. At that rate it would have taken 4 days 7 hours and 17 minutes to complete her loading, which should have been finished at 5:02 p. m. on the 29th. Her loading under the recharter was completed in the afternoon of November 11, or 13 days later.

[4] The charterer contends, however, that, the recharter having been entered into as early as November 3, all liability on its part for demurrage had then ceased. It may be assumed, without deciding, that such contention is technically correct, as the only consequences which would follow would be that, instead of charging demurrage from November 3 to November 11 directly to the charterer, as one of the items it must pay, the value of the ship's time for those 8 days would be deducted from the credit to which the charterer would be entitled on account of the earnings of the owner under the recharter. The charter hire, under the agreement in controversy, was to pay for the ship from the time she reported herself to the charterer until she had delivered her cargo on the other side of the Atlantic. Anything she earned in that period the owner was bound to deduct from its claim against the charterer, and with what she brought in for her services after the end of that time the charterer had no concern. Just be-

cause there was this interval of 13 days between the time at which, under the charter, she should have completed loading, and the time at which her loading under the recharter was in fact finished, the receipts from the recharter included moneys on which the original charterer had no claim. As, however, it would be inconvenient, if not practically impossible, to apportion the earnings under the new charter between the days the ship would have been in the services of the respondent, had the latter not refused to load, and those in which the charterer would have no interest, the simpler and shorter way to do justice between the parties is to credit the charterer with all the earnings under the recharter, and to charge it with the value of the time by which, in consequence of the refusal of the charterer to load, the ship's departure from Baltimore was delayed.

[5] Now, it may well be that, from the date the new charter was made, the charterer was not chargeable with demurrage, as fixed by the charter, but only with the real value of the ship's time. As between the parties, their agreement as to what demurrage should be paid would be, it is assumed, at least presumptive evidence of what the use of the ship was worth, and it so happens that the evidence in the record seems to show that such figure was not at all unreasonable. By the charter, demurrage was to be paid at the rate of 48 cents per registered ton, or $2,041.44 per day. The owner has put in evidence the net earnings of the ship on the voyage preceding the one for which the charterer engaged her, and for the voyage made under the recharter. The aggregate of the two is $132,720.05. On one of them the ship took 19 days 6 hours from port to port, and on the other 18 days 8 hours, the aggregate being 37 days 4 hours. Obviously, however, the owner is wrong in assuming that these earnings were made in that time. The hire covered the use of the ship while taking on and while discharging cargo. At the rate at which by the terms of the charter she was to be loaded and discharged, 4⅓ days would have been taken in loading, and about 7 in discharging. Before loading, she might be required to wait at her own charges from 2 to 4 days. There would be other small losses of time incident to leaving and arriving, so that the net earnings reported really covered a period of about 75 days, or at the rate of something over $1,770 per day. The wages of her crew and such other charges as went on, as well while she was lying in the stream or at the pier as when she was actually on her voyage, approximated $400 per day, so that, if she brought in a net return over and above the expense of even $1,770 per day, and cost $350 a day while she was idle, the net cost to her owner of every day she did not work was just about the demurrage fixed by the charter. It follows that the loss of the ship's time in Baltimore cost her owner 13 times $2,041.44, or $26,538.72.

The recharter was at $10.50 per ton of coal, as against $15 per ton under the charter now in suit. The difference of $4.50 per ton on 6,445 tons amounts to $29,002.50, all of which would constitute a charge against the charterer, had the recharter been for the same voyage as that for which the ship had been originally chartered, or for one which consumed as much of her time, and was, in other ways, as expensive

to her owner as that for which it had bargained with the charterer. It certainly was not so long. The charter in suit was for a Scandinavian port; the recharter, for one in the Dunkirk range. The owner admits that while, by the shortest route through the Pentland Firth, it takes 19 days 6 hours to go from Baltimore to Gothenburg, she made the voyage to Dunkirk in 18 days 8 hours, and it concedes that on that account a deduction of $2,500, or thereabouts, should be made from its claim. The charterer asserts that it is entitled to much more. Its contention that the ship would have gone to Sweden through the English Channel, and thereby added another day or two to the duration of the voyage, is not, on this record, persuasive; but it has put in much testimony tending strongly to show that, by the accumulated experience of the shipping community, the advantage to the shipowner from a voyage to a channel port over that to one in the Malmo range is much greater than the 40 cents per ton, or in that neighborhood, which is all the owner is willing to concede.

It is true that the charterer had not been able to show that there is a fixed and certain differential, either absolutely or relatively, between the charter rates for the two voyages; but, on the other hand, it is abundantly established that charters for channel ports are habitually, and indeed almost universally, taken at figures appreciably lower than for those which contemplate a voyage to Scandinavian countries. Constantly varying as this difference is, I am satisfied that shipowners have learned that it is at least $1.50 a ton cheaper to send their ships to a channel port than to one in the northern countries.

The owner answers that whether so much is generally true or not is beside the mark. It says that it has proved what it cost the ship to make the two voyages, and has therefore accurately established the saving to it by the substitution of Dunkirk for Gothenburg. All that it is required to account for to the charterer is what, by the exercise of due diligence and reasonable judgment, it actually was able to save for it. That may be conceded, but the fact is that the owner has not proved what either of the voyages cost it. There has been offered no testimony as to the relative costliness of discharging cargo at either of the ports in question. Its failure to do so strongly suggests that, in spite of everything it has put in evidence, it may well be that there was, in fact, a saving on the voyage to Dunkirk of as much as $1.50.

Upon the whole record, I am persuaded that an allowance of that amount is fair and reasonable, and is sustained by the evidence. $1.50 upon 6,445 tons amounts to $9,667.50, and that should be the amount to be deducted from the claimed loss of $29,002.50, the difference in the gross hire paid for the two voyages, so that the real loss to the owner on this account is $19,335, and, as has already been ascertained, for the delay of the ship at Baltimore, $26,538.72, or a total of $45,-873.72. Against this the charterer is entitled to a credit in the sum of $2,562, representing the profit of $2.80 per ton which the testimony shows it would have made on the 915 tons of bunker coal taken on by the ship, had it been allowed to furnish those coals, as the charter gave it the right to do. For the balance, of $43,311.72, the owner is entitled to a decree.