## AINESWORTH COAL & IRON CO. v. TRAFIKAKTIEDOLAGET GRANGESBERG OXELOSUND.

(Circuit Court of Appeals, Fourth Circuit. February 6, 1923.)

No. 2030.

**1. Shipping ⬤⟳38—Breached provision for bunkering held separable from charter for carrying cargo of coal.**

Where a provision that the charterer should furnish the bunker coal at market rates was inserted in the charter, without the knowledge of the owner of the ship, by mistake as to the form of charter agreed on, breach of that clause by the owner by procuring bunker coal from others, did not entitle the charterer to terminate the charter, since that provision was separable and independent of the provision for charter of the vessel.

**2. Contracts ⬤⟳173—Covenants for breach of which damages are compensation are not conditions precedent.**

Where mutual covenants go to the whole of the consideration on both sides, they are mutual conditions, the one precedent to the other; but, where they go only to a part where a breach may be paid for in damages, the defendant has a remedy on his covenant, and shall not plead it as a condition precedent.

**3. Shipping ⬤⟳36—Delivery and receipt of ship is technical acceptance by charterer of terms of charter as signed.**

The delivery and receipt of the ship constitute a technical acceptance by the charterer of the terms of the charter as signed, so that it cannot raise the question that the charter party was never in fact entered into because of the insertion therein by mistake of a clause as to bunkers.

**4. Shipping ⬤⟳58(2)—Respondent held precluded by cross-libel from contending charter was not in force.**

Where respondent filed a cross-libel, claiming damages for breach of the provision entitling it to furnish the bunker coal for failure to transport the cargo, it could not contend thereafter that the charter under which it sought such recovery had never gone into effect.

**5. Shipping ⬤⟳58(3)—Measure of shipowner's damage for breach of charter stated.**

Where a charterer breaches charter party by refusing to furnish the cargo, the shipowner is entitled to recover the net amount which would have been earned under the charter sued on, less the net amount earned, or which could with reasonable diligence have been earned, during the time required for the voyage named in the charter.

**6. Admiralty ⬤⟳105—Claim for increased damages should be made below.**

Though libelant can raise the question that it was entitled to an increased award on the respondent's appeal from the decree for libelant, it is better to raise the question in the lower court and bring it up by cross-assignment of error, which would enable that court to consider the arguments with all the facts fresh in its mind.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore.

Libel by the Trafikaktiedolaget Grangesberg Oxelosund, a corporation existing under the laws of the Kingdom of Sweden, against the Ainesworth Coal & Iron Company, a corporation, to recover for an alleged breach of a charter party for a steamship From a decree deciding for libelant on the merits (273 Fed. 215), and a subsequent

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

decree fixing the amount of damages (281 Fed. 231), respondent appeals. Affirmed.

George Forbes and John Phelps, both of Baltimore, Md. (Henry L. Wortche, of Baltimore, Md., on the brief), for appellant.

Charles R. Hickox, of New York City, and R. E. Lee Marshall, of Baltimore, Md., for appellee.

Before KNAPP and WADDILL, Circuit Judges, and McDOWELL, District Judge.

WADDILL, Circuit Judge. This is an appeal from a decree of the United States District Court for the District of Maryland, at Baltimore, entered on May 31, 1922. The libel was filed by the appellee, a Swedish corporation, against the appellant, an American corporation (believed to be chartered under the laws of Pennsylvania), on the 27th of October, 1920. The parties will be referred to as libelant and respondent.

The litigation arose out of an alleged breach of a charter party for the steamship Narvick, dated September 20, 1920, whereby the owner, the libelant, chartered the Narvick to the respondent for a voyage from Baltimore, Norfolk, or Philadelphia to a Scandinavian port, to take a cargo of about 6,500 tons of coal, at $15 per ton and demurrage at a specified rate. On the 13th of January, 1921, the respondent filed its answer, admitting the execution of the charter party and the nonperformance thereof by it, which, it alleged, was by reason of the prior breach of the contract by the libelant; and the respondent, by its cross-libel, filed as a part of its answer, alleged that one of the terms of the charter party provided, "Bunkering coal required to be supplied by the charterers at the loading port at the current rate," and that this provision was a material part of the contract, and of material financial interest to the respondent. It was further alleged that "respondent procured approximately 1,500 tons of bunker coal at the port of Baltimore at current rates, for the purpose of bunkering said vessel Narvick, and was ready and prepared to load such coal on said vessel," but on October 25th respondent learned that the vessel had already taken its bunkers on board through other sources, in violation of the contract, and prevented this respondent from supplying bunker coal at said current rates," and thereupon respondent notified the libelant that respondent considered the charter party broken and canceled, and the libelant responsible in damages for loss of profits of $10,000.

On March 3, 1922, respondent amended its answer and cross-libel, alleging that in anticipation of the arrival of the Narvick, it had procured 1,200 tons of bunker coal at Baltimore, at the price of $12 a ton, for the purpose of bunkering the vessel, and that by reason of the fact that the vessel had already taken its bunker coal on from other sources, the respondent and cross-libelant "lost a profit on approximately 900 tons at $4.33 per ton, or $3,907, and was obliged to sell the entire 1,200 tons at a loss under the price which it paid therefor of $4,540," making the loss upon the bunkers $8,447. It was also alleged that "the respondent cross-libelant, by reason of the breach aforesaid, lost the profits of its sale of 6,445 tons of coal at the contract selling price of

$29 per ton over and above the cost of the coal, freight, and expenses of $26.50 per ton, or a net loss of $2.46 on 6,445 tons, or a loss of profits of $15,854.70, and a total loss of $24,301.07."

On the 8th of March, 1921, the libelant filed its answer to the cross-libel, and denied that the clause regarding the bunkering of the vessel by the charterer was material in the sense alleged by the respondent, or that the charter party was broken or canceled by the libelant having bunkered the Narvick.

The contest largely centers around the clause in the charter party requiring the charterer to supply bunkers for the Narvick, and the relation said provision bears to the entire contract, and the effect of the breach thereof by the owner. The confusion respecting the furnishing of bunkers for the ship came about in this way:

The charter was negotiated in behalf of the foreign owner of the ship by its New York brokers, on cabled instructions, and provided that it was to be on the clear July Washington form of coal charter. It seems there were two such forms, one containing a provision for the charterer furnishing bunkers, and the other making no reference thereto, and it was the latter contract, without the clause, that the brokers and owner had in mind, and supposed had been used, and accordingly they instructed the coal agency with which they had a general contract for bunkering, to furnish the necessary bunkers at the port of Baltimore, where the ship was delivering cargo, before entering upon the charter to the respondent.

The District Court held (a) that the provisions of the charter party for bunkers was a separable and independent undertaking, and could be adequately compensated for in damages; (b) that the failure of performance by the owner of the provisions with respect to bunkers did not justify the charterer (respondent) in attempting to annul and avoid the contract; (c) that loss on the sale of the bunker coal, if the charterer had acted promptly, would not have been a serious matter, as the coal was to be furnished at the current market rate, which presumably could have been obtained from some one else; (d) that the provision as to bunkers was not of the essence of the contract; and (e) that the charterer was wrong in refusing to load the cargo under the charter, and the owner was entitled to recover damages resulting from the charterer's unjustifiable effort to avoid the contract.

The result was that the cross-libel was dismissed, and a decree entered in behalf of the libelant against the respondent, the appellant herein, for $43,311.72, the court itself having heard and passed upon the question of damages, subsequent to the decision as to liability. From this decree, the appeal in this case was taken. The District Court's decision on the merits will be found in 273 Fed. 215, and that on the question of damages in 281 Fed. 231.

The appellant, respondent and cross-libelant in the lower court, makes many assignments of error to the ruling and action of the trial court, which need not be given in detail, as they relate generally to the action of the court as stated above, and to the court's failure to dismiss the libel because of the invalidity of the charter by reason of misunderstanding in reference to the clause providing for furnishing bunkers

for the ship, and to the court's assessment of damages to libelant, and the manner and method of arriving at the same, as set forth in its opinion.

[1] First. Was there error in the court's ruling respecting the effect of the clause in the charter party providing for furnishing bunker coal, namely, that it was separable and independent from that of the charter which provided for the transportation of 6,500 tons of coal from Baltimore, Norfolk, or Philadelphia to a Scandinavian port at $15 per ton; that the clause as to bunkers was not of the essence of the contract, but was one for the breach of which adequate compensation in damages could be made; and that, under the facts and circumstances of this case, the failure of the shipowner to observe the clause as to furnishing bunkers, did not warrant the charterer's attempt to rescind and annul the entire contract? Manifestly there was not. When the entire transaction is taken into account in the light of the real facts and circumstances surrounding the same, any other conclusion than the one reached would be unreasonable, and in the result operate most disastrously and unfairly to those innocent of any wrong motive or purpose in what was done. That there was a mistake in the insertion of the clause in reference to bunkers is apparent, and that neither party knew of its existence is quite clear. Just who first discovered it, and when, may not be entirely certain; but suffice to say that its effect should not be availed of for the purpose, attempted by the charterer, of terminating the contract.

The facts bearing on the insertion of that clause, and the conduct of the parties in reference thereto, are reviewed at considerable length by the lower court, and there is but little dispute, save as to what occurred in the conversations over the phone between libelant's representative, Ramsey & Co., of Baltimore, and respondent's representative, Ainesworth, at Philadelphia. The District Court heard and saw the witnesses testifying as to these conversations, and we think properly settled the differences in dispute in favor of the libelant, which places it in the position of innocently bunkering the ship at Baltimore. When informed of the clause in the contract giving that privilege to the respondent, the libelant did all that could be reasonably asked of it; in effect, it agreed to make the respondent whole in the transaction, either by paying for the coal, and the profits, or unloading the same, which respondent declined, and promptly sought to rescind the contract of affreightment, utterly regardless of the rights of the owner, and of the resultant consequences from such reckless course. The contract of affreightment was a large one, involving in freight to the shipowner approximately $100,000, and to suppose that the same in its main purpose, should be frustrated by the erroneous insertion of a clause only incidentally affecting the same, and from which the profit to the charterer might have been merely nominal, and at most not of a large amount, is unthinkable, especially where the misunderstanding respecting the same could be compensated for in damages. The contract was to charter a large ocean-going ship to carry thousands of tons of coal to a foreign port at a remunerative charter hire. The matter of who should put on the bunkers was but a small incident, and for the dam-

ages arising from the owner's mistake in placing the bunkers, instead of the charterer doing so, the latter had the ship's hire actually in hand, from which it could have been saved harmless.

[2] The learned judge of the lower court aptly stated the law applicable to this condition, as laid down by Lord Mansfield, as follows:

"Where mutual covenants go to the whole of the consideration on both sides they are mutual conditions, the one precedent to the other; but when they go only to a part where a breach may be paid for in damages, there the defendant has a remedy on his covenant and shall not plead it as a condition precedent." Boone v. Eyre, 1 H. Bl. 273.

See Kauffman v. Raeder, 108 Fed. 171, 47 C. C. A. 278, 54 L. R. A. 247.

[3] Second. The assignment of error presenting the question that the charter party was never, in fact, entered into because of the insertion of the clause as to bunkers, is clearly without merit. What is said in the last paragraph in regard to the effect of the bunker clause is a sufficient answer to the contention; but, in addition, it may be said that the delivery and receipt of the ship, constituted at least a technical acceptance by the charterer of the terms of the charter as signed. Compania Bilbaina de Navegacion de Bilbao v. Spanish-American Light & Power Co., 146 U. S. 483, 13 Sup. Ct. 143, 36 L. Ed. 1054.

[4] Moreover the appellant should not now be heard to interpose this defense under the pleadings in this case. Within 90 days of the filing of the original libel, to wit, on the 13th day of January, 1921, the appellant respondent filed its answer and cross-libel, asserting a claim under the charter, in connection with the bunkering of the ship of $10,000, and by an amended answer and cross-libel on the 3d of March, 1922, the claim was restated, and reduced to $8,447, and a further claim asserted for damages under the charter party, arising from the loss of profits on the cargo of 6,445 tons of coal at $2.46 per ton, amounting to $18,854.70, the two aggregating $24,301.07. Upon the assertion of the said two items, bonds were required and duly given by the ship, as security for the same; the first bond being for $12,000 and the second for $18,000. The opinion of the District Court on the merits was filed before objection to the validity of the contract based upon its never having been actually entered into was made; and surely such defense will not be entertained, coming from one asserting two causes of action, for approximately $25,000, based upon the charter's validity.

Third. Upon the assignment of error as to the sufficiency of the amount allowed by the court, consideration will be given thereto in the light of the position taken by the appellee in argument, though no objection on its part was made to the allowance in the District Court, and was for the first time raised here. The determination of the amount that should be allowed under the respective contentions is really more difficult of solution than a decision on the merits of the case. Upon the abandonment of the contract of affreightment by the respondent, the libelant immediately sought to procure other service for the vessel, and within a comparatively short time, another charter was entered into to take a cargo from Baltimore to Dunkirk, instead

of to Gothenburg, for a reduced sum, the total charter hire under the recharter being for the sum of $67,672.50, as against $96,670 under the original charter. The District Court awarded the libelant:

| | |
|---|---:|
| For loss of freight at $4.50 a ton on 6,445 tons of coal covered by the first charter | $29,002.50 |
| Also for loss of time while the new charter was being obtained, from October 29th, when the loading should have been completed under the original charter, to November 11th, when the same was completed under the recharter, the demurrage thus allowed for being at the figure named in the original charter | 26,538.72 |
| | $55,541.22 |
| The court gave credit to the charterer for a difference of $1.50 per ton between the recharter rate to Dunkirk, and the original charter hire to Gothenburg, viz. | 9,667.50 |
| Leaving a total of | $45,873.72 |
| From this last-named sum the court further allowed a reduction of $2.80 a ton on 915 tons of bunkers, awarded the charterer as profits it would have made had it supplied the bunkers | 2,562.00 |
| Leaving the balance decreed for of | $43,311.72 |

Libelant earnestly insists that the sum allowed it is less than what it is entitled to; that the differential of $9,667.50, at $1.50 per ton, should be reduced to $1 per ton, making a difference of $3,222.50, and the amount to be awarded it $46,534.22, which it says is the least it should be decreed, and that to this sum should be added the $2,562 already deducted on account of bunkers, making a total recovery in its favor of $49,096.22.

[5] The correct rule for estimating damages in this class of cases is that the shipowner is entitled to the net amount that would have been earned under the charter sued on, less the net amount actually earned, or which could with reasonable diligence have been earned during the time required in the voyage named in the charter. The Gazelle, and Cargo, 128 U. S. 474, 487, 9 Sup. Ct. 139, 32 L. Ed. 496; McNear v. Leblond Line, 123 Fed. 384, 389, 61 C. C. A. 564; Venus Shipping Co. v. Wilson, 152 Fed. 170, 171, 81 C. C. A. 368; Smith v. McGuire, 3 Hurl. & N. 554. While there is much force in the contentions made for an increase of the award to the libelant, still we are forced to the conclusion, upon full consideration given to the entire testimony, that the action of the lower court in making its award, was in substantial conformity to the rule above stated. The circumstances of the case are unusual and to arrive at just what should be done in dealing with the respective items of damage claimed was by no means free from difficulty, and, as we view it, the conclusions reached by the District Court are right, and more in accord with justice than the claims made would have been.

[6] We cannot lose sight of the fact that, while the appellee is acting within its rights under the law (The John Twohy, 255 U. S. 77, 79, 41 Sup. Ct. 251, 65 L. Ed. 511), in raising the question of an increased award in this court, still to have done so in the lower court, and come up by cross-assignment of error, would have enabled that court to have

given consideration to the persuasive arguments that were made here, with the facts all fresh before it.

The appellant herein has referred the court to quite an array of authorities on the several questions herein considered, with a view of sustaining its. contentions. Within the limits of this opinion, it would not be practicable to refer to these cases, further than to say the same have been fully considered, and we think will be found not to militate against the views of the court in this case, under the facts presented.

It follows, from what has been said, that the decree of the District Court will be affirmed, with costs.

Affirmed.

McDOWELL, District Judge, concurs in the conclusion reached.