## UNITED TRANSP. CO. v. BERWIND–WHITE COAL–MINING CO.

(District Court S. D. New York. January 30, 1923.)

Shipping ⊜⟶43—Under charter party authorizing charterers to cancel charter party not later than day of ship's readiness, if she is not ready for cargo on or before July 31, held, that tender on July 31, after custom house had closed without entry, was good tender; no entry being required for purpose of lading (Act Feb. 13, 1911 [Comp. St. §§ 5559–5571]; Rev. St. §§ 2774, 2870 [Comp. St. §§ 5470, 5558]; Rev. St. § 2869).

Under Act Feb. 13, 1911 (Comp. St. §§ 5559–5571), where charter party authorized charterers to cancel charter party not later than day of steamer's readiness, if steamer was not ready for cargo on or before July 31, loading lay days to commence "from time steamer is ready to load and custom house formalities are fulfilled," held that, in view of Rev. St. §§ 2869, 2870 (Comp. St. § 5558), tender on July 31 of ship which arrived on that day after custom house had closed was good tender; no custom formalities being required to lift cargo, except report required by Rev. St. § 2774 (Comp. St. § 5470), which may be made after ship has lifted cargo.

In Admiralty. Libel by the United Transportation Company (the Steam Navigation Company of Canada, Limited, substituted) against the Berwind-White Coal-Mining Company. Decree for libelant. Affirmed in 13 F.(2d) 282.

James K. Symmers, of New York City, for libelant.

Leo J. Curren, of New York City, for respondent.

LEARNED HAND, District Judge. This is a libel in personam for cancellation by the charterer of a charter party entered into on June 18, 1919, for the ship Kerry Range. The charter party in the tenth article provided: "Should the steamer not be ready for cargo at her loading port on or before July 3, 1919, the charterers or their agents to have the option of canceling this charter party at any time not later than the day of steamer's readiness." The Kerry Range appeared at Hampton Roads, the port of lading, on July 31, 1919, at 4:45 p. m., and the owner's local agent at once applied to the custom house for leave to make entry that evening. As the hour was 5 p. m. when he reached the custom house, this

was refused, and the vessel was not entered till the next morning. However, she was tendered to the charterers at about 5 p. m. and was refused on the next day, because she had not completed her entry on July 31st, as required. The loading lay days under article 5 commenced "from the time steamer is ready to load and custom house formalities are fulfilled."

The vessel being ready to go under the tips at once, the only question is whether any law forbade her to do so. There is no such law, unless it be chapter 46 of Session 3 of the Sixty-First Congress, 36 Stat. 899 (Comp. St. §§ 5559–5571). Revised Statutes, § 2774 (Comp. St. § 5470), does not forbid a vessel's lifting cargo before the master makes the report therein prescribed. Now chapter 46 of 1911 had its origin in Revised Statutes, § 2871, as appears from section 6 thereof, which repealed that section, as well as the Act of June 30, 1906 (34 Stat. 633), which amended it. Revised Statutes, § 2871, is part of title 34 for the "Collection of Duties" and of chapter 5 of that title, relative to "Unlading." It prescribed that, in order to unlade at night, a special license must be obtained and a bond given.

As I read it, though the meaning is not wholly clear, this section did not confer the right to unlade at all; that rested upon Revised Statutes, §§ 2869, 2870 (Comp. St. § 5558). It merely gave a right by special license to unlade by night, which was otherwise forbidden by section 2872 (Comp. St. § 5562). Nothing was said of lading; obviously this was merely a customs regulation. In 1906 this statute was amended, and then included lading as well as unlading. However, it kept its place in the body of chapter 5 concerning unlading, and apparently again presupposed that there had been a permit to land the goods. Its lading provision can therefore hardly have been broader than to cover goods which required an entry permit.

The present statute of 1911 in section 1 preserved the original act, except that it made clear that its application was limited to goods that had been properly entered. Whatever may be thought of Revised Statutes, § 2871, in its original or amended form, there can be no doubt that this was merely a supplementary regulation, which was limited to "entered" goods. If so, in speaking of the "lading" of goods, it meant to cover only "entered" goods; i. e., goods entered in bond or exported for drawback.

Section 2 of the statute for the first time, as I understand it, created the right of "pre-

liminary entry." This was to be "upon arrival," and obviously in the stead of the regular entry. It is indeed very difficult to see why the word "lading" should have been used in it at all. Goods in bond or to be exported for drawback would presumably have been already "entered." But, passing that, whatever it means, it clearly did not intend to subject to "preliminary entry" goods which could never be "entered" at all; i. e., goods to be exported from the mass of commodities of the country. No formalities are required to lift such cargo, except that the ship shall report under Revised Statutes, § 2774. No one suggests that a ship may not lift cargo before that report is made.

Therefore it seems to me clear that the Secretary of the Treasury was altogether right in ruling (Treasury Decisions, No. 37380) that the statute, in speaking of lading, applies only to goods in bond and goods to be exported for drawback. Being of necessity exempt from any "entry," how could general goods be subject to "preliminary entry"? Some meaning must no doubt be attributed to the word "lading"; but it has a meaning, if I read it as I do, and that, too, the only meaning which can give any coherent sense to the statutes as a whole.

Therefore I conclude that there were no custom house formalities with which the Kerry Range must have complied on July 31st, even though I read article 10 with article 5 of the charter party, as the respondent wishes. The tender was therefore a good one. There is no merit in the defense; so far as can be seen, it was set up only to avoid a contract then grown unprofitable. I need not consider the supposed "practical construction" of the charter party. It was plain enough.

Decree for libelant.