**CARGO SHIPS EL YAM, Ltd.,**
Plaintiff,

v.

The **STEARNS & FOSTER CO., Inc.,** Everest Shipping Corporation, James E. Stearns, Fricis V. Grauds and Harry Thomas Randle d/b/a Harry T. Randle & Co., Defendants.

United States District Court
S. D. New York.

Nov. 17, 1955.

On Issue of Damages March 27, 1956.

Krisel, Beck & Taylor, New York City, for plaintiff, Max Taylor, Roman Beck, New York City, of counsel.

Hughes, Hubbard, Blair & Reed, New York City, for defendant, The Stearns & Foster Co., Inc., Richard W. Hogue, Jr., Charles Donnelly, New York City, of counsel.

Alvin A. Berg, New York City, for defendants Everest Shipping Corp. and Francis V. Grauds.

Dow & Symmers, New York City, for defendant Harry Thomas Randle, d/b/a Harry T. Randle & Co., William A. Wilson, William J. Troy, New York City, of counsel.

Gunn, Neier & Daiker, Port Washington, N. Y., for defendant James E. Stearns, Wilford Neier, Port Washington, N. Y., of counsel.

DAWSON, District Judge.

This cause was tried by the Court without a jury, pursuant to stipulation of all the parties.

Findings of Fact

The plaintiff is a corporation organized under the laws of Israel and was, at all material times, the owner of the SS Akko. On May 8, 1953, it executed a charter party providing for the chartering of the ship for a period of from three to five months. The charter party was signed on behalf of the plaintiff by Maritime Overseas Corporation, its duly authorized agent. The party chartering the ship was stated in the charter party to be Stearns and Foster Company of Lockwood and Cincinnati, Ohio, and the charter party purported to be signed on its behalf as follows: "Everest Shipping Corporation, as agents for Stearns & Foster Company, F. V. Grauds, President".

The defendant, The Stearns & Foster Co., Inc. (hereinafter called "Stearns & Foster") is an Ohio corporation engaged in the business of manufacturing and selling bedding and mattresses. It has never been in the shipping business. The evidence is clear, and the Court finds as a fact, that Stearns & Foster never authorized the execution of the aforesaid charter party.

The circumstances which led up to this situation involve an unusual cast of characters. The first is the defendant James E. Stearns who, at the time of the execution of the charter party, was twenty-five years of age, a young man of engaging personality, but apparently devoid of both a sense of responsibility and an appreciation of ethics. Young Stearns was distantly related to certain officials of Stearns & Foster and is a descendant of one of the founders of this Company. He apparently had been well educated and was of average intelligence. After he was graduated from college, he served for a brief period in the Navy, and then took a job as a salesman in the New York office of Stearns & Foster.

He held this job for about two years, leaving their employ in the early part of 1951. He then embarked, with a partner, upon the operation of a dance studio. This, however, did not continue for long. At the time of the incidents involved in this lawsuit, he was unemployed and living on the income of a trust fund which furnished him approximately $300 a month.

During the latter part of April, 1953, young Stearns met William L. Spaniard who, at the time, was working as manager of the chartering department of the defendant Everest Shipping Corporation, a New York Corporation with only a few employees, which was engaged in the business of being a ship broker and of operating steamships. Young Stearns told Spaniard that he would like to get into the shipping business and asked his advice.

Spaniard then arranged for a luncheon conference on or about May 4, 1953 between Stearns, himself, and George C. Kiskaddon, an employee of Harry T. Randle who, under the name of Harry T. Randle & Co., was engaged in the business of steamship broker. Kiskaddon was a man of many years experience in the shipping business.

Stearns advised Kiskaddon and Spaniard of his connections with Stearns & Foster, giving them to believe that he was actively connected with it, and that he and his family controlled the Company. He repeated his desire to get into the shipping business. There was some discussion of the business procedures involved in chartering ships, securing cargos, etc. Stearns was advised by Kiskaddon at this luncheon that it would be practically impossible for him as an individual to engage in the business of chartering ships, but that if Stearns & Foster, an established and reputable corporation, wished to do so, this could be accomplished without too much difficulty.

Shortly thereafter Stearns advised Spaniard and Kiskaddon that Stearns & Foster wished to go into the shipping business, that he was authorized to represent that corporation, and that a ship should be chartered.

Thereupon, Kiskaddon, acting as an employee of the defendant Randle, and within the scope of his authority as such, communicated with Mr. Feder of Maritime Overseas Corporation, a firm of ship brokers who were acting as managing agents of the plaintiff, and asked if the plaintiff had a ship which it wished to charter to a company which was described as a first class charterer. Plaintiff's representative indicated that it did have such a ship, and on May 7, 1951, all of the significant terms of the charter were orally agreed upon between Kiskaddon and Feder, subject to plaintiff's approval of the proposed charterer. Kiskaddon then stated that the charter was to be taken by Stearns & Foster and that he was acting on their behalf.

On May 8, 1951, plaintiff's agent, having ascertained from a Dunn & Bradstreet report that Stearns & Foster was a substantial and financially sound corporation, accepted that Company as the charterer and confirmed the terms of the charter in a letter to Harry T. Randle & Co.

Thereafter, the office of Harry T. Randle prepared the charter party, had it executed on behalf of the plaintiff as the owner of the ship, and sent it to the Everest Shipping Corporation for execution on behalf of the charterer. Before Everest Shipping Corporation signed the charter party, Spaniard asked young Stearns for some authorization which would give them power to sign it on behalf of Stearns & Foster. Young Stearns thereupon personally dictated and signed a letter which was written on the letterhead of "Freedman & Slater, Inc., International Freight Forwarders & Customs Brokers" at whose office he apparently was making his headquarters. This letter read as follows:

"May 14, 1953
"Everest Shipping Company
25 Broadway
New York, N. Y.
"Gentlemen: *Attention:*
*Mr. William Spaniard*
"This is to advise you of the existence of an Agency on your part

to act in the interests of the Stearns & Foster Company and myself, to the same degree and authority as if action were personally taken.

"Exact transaction must at all times be authorized by this person; specific arrangements made at time of decision.

"Very truly yours,
"/s/ James E. Stearns
"James E. Stearns, Chairman"

Neither at the time of the writing of this letter, nor at any time thereafter, or heretofore, had young Stearns been Chairman of Stearns & Foster nor, apparently, of any other company. He had received no authorization from Stearns & Foster to represent them or to write the letter to Everest Shipping Company. He admitted personally composing and dictating the letter. He stated that he intended the letter to mean only that Everest Shipping Corporation could represent him personally and that it was given to them so that they would have some assurance that if Stearns & Foster later went into the shipping business, Everest Shipping Corporation would be protected. He, however, had no power to give them this assurance and the letter did not give such assurance, nor was it limited to any such assurance. For a young man with a colledge education and average intelligence to endeavor by this far-fetched explanation to explain away the authorization contained in this explicit letter makes him unworthy of belief.

On May 15, 1953, Everest Shipping Corporation, having received the aforesaid letter from young Stearns, through its President, Fricis V. Grauds, and with the approval of young Stearns, signed the charter party in the name of Stearns & Foster and affixed their signature thereto as the agent for Stearns & Foster.

Young Stearns thereupon orally authorized Everest Shipping Corporation to act as agent for Stearns & Foster in the management of the ship and authorized Kiskaddon to negotiate for charters for the ship. Kiskaddon testified that he was acting as the broker for Stearns & Foster.

The SS Akko was tendered by the plaintiff to Everest Shipping Corporation, purporting to act as agent, pursuant to said charter party, at Norfolk, Virginia, at 7:30 A.M. on June 11, 1953, and was accepted and then departed for Brazil with a cargo of coal at 5:00 A.M. on June 12, 1953. Everest Shipping Corporation paid the first installment of rental out of its own funds. The cargo charter party had been negotiated by Kiskaddon of Harry T. Randle & Co. and the cargo charter party was executed by Everest Shipping Corporation as agent for Stearns & Foster.

Thereafter, two other cargo charters involving the Akko were similarly executed by Everest Shipping Corporation, as agent for Stearns & Foster. When payments were received for charter parties by Everest Shipping Corporation, they deposited them in an agency account in their own name, with no indication of any interest of Stearns & Foster therein, and then paid out the sum of $2,500 therefrom for the personal account of young Stearns.

Six other time charters on other vessels were also executed by Everest Shipping Corporation, purportedly as agent for Stearns & Foster, during the latter portion of the month of May and up through the latter part of June, 1953, without any authority to execute such charters from Stearns & Foster. A number of cargo charters were executed with respect to these vessels by Everest Shipping Corporation, either as agent for Stearns & Foster, but without authority to act for that Company, or as agent for Maryland Steamship Corporation, a Liberian corporation which young Stearns either intended to purchase or to organize, but which was never purchased or organized by him. These latter cargo charters were negotiated by Kiskaddon. Only the SS Akko is involved in this particular action.

Neither Spaniard nor Kiskaddon communicated with Stearns & Foster to as-

certain directly from that Company whether young Stearns had authority to represent it. However, an employee of the Frank B. Hall & Co., Inc., insurance brokers, wrote to Stearns & Foster in Cincinnati, Ohio, on June 1, 1953 seeking insurance business and stating in part:

"It has come to our attention that you have chartered two or three ocean going vessels and we are wondering whether you have given consideration to insuring Time Charterers liabilities."

The Treasurer of Stearns & Foster replied to this letter, under date of June 3, 1953, as follows:

"We have your letter of the 1st stating that it had come to your attention that we have chartered 2 or 3 ocean-going vessels. We do not understand this for as far as we know we have not chartered even so much as a rowboat. If whatever called your attention to this is available, we would like to see it as we can not understand how this misinformation could be circulated."

On June 10, 1953, Stearns & Foster received a second letter from Frank B. Hall & Co., Inc. which stated, in part, as follows:

"We understand Mr. Stearns is presently in New York conferring with the Everest Shipping Company which is acting as Agents for the Maryland Steamship Co. This latter company we understand is an affiliate or subsidiary either of the Stearns & Foster Co. or another subsidiary known as Stearns Shipping Co. Either of the Stearn organizations time chartered a number of ships and we are informed sub-chartered these on identical terms for operation by Everest Shipping Co.

"We have been asked to submit for consideration an annual Open Cover to protect the liabilities of all parties at interest and we expect that Mr. Stearns will make his decision in this regard during his present visit to New York.

"We regret having disturbed you unnecessarily since at the time of writing our letter we had already been approached by your Agents in New York. At the time we were dealing with Everest Shipping Co. as principals so that the relationship with The Stearns & Foster Co. was not immediately apparent."

The Treasurer of Stearns & Foster replied to this letter, under date of June 11, 1953, as follows:

"We appreciate very much your letter of June 8 with further reference to the ship leasing mystery. The daily developments have proven very interesting and it will not be long before someone in the business of chartering ships will be due for a rude awakening if they are banking on this company to stand behind their contract. We have no affiliates or subsidiaries and we never heard of the Stearns Shipping Company.

"From other sources we do find that there is a Mr. Stearns doing the things attributed to us, but he is in no way connected with this company and does not represent us in any way. We hope that anyone counting on us to back the contract will not be too disappointed when the true facts are known to them."

An employee of Frank B. Hall & Co., Inc., at a luncheon conference with Spaniard on June 8, 1953, advised Spaniard that Stearns & Foster had stated, in correspondence, that it had no interest in the shipping business and had not chartered any ships.

On June 10, 1953, a Mr. Sheffield of Cargo Ships & Tankers, Inc., brokers engaged in the purchase and sale of ships, telephoned to Stearns & Foster Company to see if he could sell it a vessel. He talked to the president of Stearns & Foster who advised him that the Company had no interest in the shipping business and had not chartered any ships. Sheffield then called Kiskaddon and told him of the telephone conversation. Kiskaddon advised his employer, Harry T.

Randle, of this conversation. Randle immediately called Spaniard suggesting that he get in touch with young Stearns and straighten the matter out.

Spaniard telephoned Stearns & Foster on June 12, 1953 and talked for a few minutes to Russell Dwight, the President of the Company. The testimony as to what was said in this telephone conversation is somewhat confusing. Mr. Spaniard testified that he told Mr. Dwight that he had heard that the latter was being bothered by various phone calls from brokers, and that he thought this was unfair. He stated that he told Dwight that: " * * * we had chartered, I believe at the time, three vessels in the name of Stearns & Foster through young Jim here in New York, and we were subchartering immediately—I mean at that time we were in the process of subchartering—the Stearns & Foster vessels into the Maryland Steamship Company which was owned by Mr. James Stearns. I asked Mr. Dwight to please take my telephone number and if he got any more calls to either ask for Mr. Grauds or myself and we would take care of it."

Apparently Mr. Dwight felt that some mistake had been made in the use of the Stearns & Foster name and that this mistake was now being straightened out. He reported to the Treasurer of the Company that: "Mr. Spaniard of this Everest Shipping Company had called him and said that Jimmy had asked him to call, that the Stearns & Foster name had become involved by mistake and he didn't want to cause us any embarrassment and there would be no more of it and it would all be straightened out."

Nothing further happened to bring this matter to the attention of Stearns & Foster until June 26th when they were advised by a steamship line that the name of Stearns & Foster was actually on a ship charter. They promptly communicated with Randle & Co. who were named to them as the brokers involved and advised Randle & Co. that they had never authorized the chartering of a ship and that they had no interest in it. Stearns & Foster thereupon also caused an advertisement to be placed in the Journal of Commerce notifying the public generally that it had "not at any time authorized the chartering of any vessels in its name, or for its account, and has no responsibility for any Charter Parties reported to have been made in its name or for any of the vessels covered thereby." They advised both Randle & Co. and Everest Shipping Corporation that they would have nothing to do with the charters.

■■■■ It is the contention of the plaintiff that, even if Stearns & Foster had not authorized Everest to charter ships in its behalf, Stearns & Foster are now estopped to deny such authority by reason of the failure of Stearns & Foster to act when it first heard that ships had been chartered in its name and that its failure so to act constituted an affirmance of the unauthorized transactions. The question of whether an inference of ratification or estoppel exists as to Stearns & Foster is a question of fact. See Restatement of the Law of Agency, §§ 94, 103. The Court concludes that as a matter of fact no such estoppel has been established.[1] There was no sufficient proof that Stearns & Foster knew that any action taken by Everest Shipping Corporation would have the effect of imposing upon them the liability for the chartering of a ship. The whole purport of the conversation between Spaniard and Dwight was consistent with the idea that the name of Stearns & Foster had been used by mistake and that the matter was being straightened out. Their actions throughout were consistent with a refusal to recognize the charters and a refusal to recognize young Stearns as the agent.

1. See Restatement of the Law of Agency, § 94, Illustration 1:
 "Purporting to act for P but without power to bind him A buys goods from T and pays the purchase price out of his own money. P, learning of this, does nothing. There is not sufficient evidence of affirmance."

There was no competent proof from which the Court could conclude as a matter of fact that the defendant Grauds, the President and sole stockholder of Everest Shipping Corporation, conspired with the defendants Randle and young Stearns to induce the plaintiff to charter its vessels upon false representations. The evidence indicates that whatever Grauds did, he did as President of Everest Shipping Corporation and in reliance upon the statements made to him by his employee Spaniard. Grauds denied that he heard the telephone conversation between Spaniard and Dwight and while there was some proof to the contrary by the witness Siebel, the memory of this witness was so poor as to the conversation that it would be impossible to draw any conclusion therefrom that Grauds had been in a conspiracy with Randle and Young Stearns to deceive the plaintiff. I could not have reached the same conclusion as to Spaniard, but no claim has been asserted against Spaniard.

To summarize, we have a situation where—

(a) Young Stearns, without authority from Stearns & Foster, advised Everest Shipping Corporation of the existence of an agency on their part to act both on behalf of himself and of Stearns & Foster;

(b) Everest Shipping Corporation, purporting to act as agent for Stearns & Foster, and with the knowledge and approval of young Stearns, but without authority from Stearns & Foster, executed a time charter of the SS Akko by which, acting as agent for Stearns & Foster, it chartered that ship from the plaintiff;

(c) The terms of the charter party were negotiated by Harry T. Randle & Co., purporting to act as agent for Stearns & Foster, and Harry T. Randle & Co. delivered to the plaintiff a photostat of the executed charter confirming the agreement between the plaintiff and Stearns & Foster;

(d) The plaintiff delivered the ship to Everest Shipping Corporation, as agents for Stearns & Foster; and the ship carried a cargo of coal to Brazil pursuant to a cargo charter party negotiated by Harry T. Randle & Co. and purported to be negotiated on behalf of Stearns & Foster;

(e) When Stearns & Foster became acquainted with what had been done, it refused to recognize or adopt the charter party or to be responsible in any way for it;

(f) Plaintiff contends that as a result of the foregoing, it incurred damages.

### Conclusions of Law

Plaintiff has asserted five causes of action as follows:

■ 1. A cause of action against Stearns & Foster on the ground that that Company is liable as principal on the charter party. Since the Court has found, as a matter of fact, that Stearns & Foster never authorized either young Stearns or Everest Shipping Corporation to enter into the charter party and that Stearns & Foster never ratified or adopted the charter party, the Court concludes that, as a matter of law, Stearns & Foster is not liable on the cause of action asserted against it. The first cause of action set forth in the complaint is dismissed.

■ 2. A cause of action against Everest Shipping Corporation for breach of warranty in that it warranted, by execution of the charter party, that it was authorized to do so on behalf of Stearns & Foster when, as a matter of fact, it had no such authority. Since the Court has found, as a matter of fact, that Everest Shipping Corporation did execute the charter party as agent for Stearns & Foster, and since it has found, as a matter of fact, that it was not authorized to do so, the Court concludes, as a matter of law, that Everest Shipping Corporation is liable for breach of its warranty of authority and that judgment should be entered against Everest Shipping Corporation. Moore v. Maddock, 1929, 251 N. Y. 420, 167 N.E. 572, 64 A.L.R. 1189.

■ 3. A cause of action against James E. Stearns for breach of contract

on the ground that Everest Shipping Corporation was acting ostensibly for Stearns & Foster but, in fact, it was acting as agent for young Stearns as an undisclosed principal. This cause of action, as stated in the complaint, seeks to hold young Stearns on the contract as an undisclosed principal and not for breach of warranty of authority. Since it is clear that the plaintiff did not intend to make a contract with young Stearns, the great weight of authority and generally accepted rule is that a person in young Stearn's situation who misrepresented his authority is not liable on the contract, but that he would be liable for breach of implied warranty of authority. Williston Contracts (2d Ed. 1936), § 282 at p. 831; Mechem, Agency, (2d Ed., 1914), § 1395; 3 C.J.S., 1936, Agency, § 208; Liability on the Contract of One who Without Authority Assumes to Contract for Another, 1926, 42 A.L.R. pp. 1310, 1312; see also 1929, 60 A.L.R. pp. 1348, 1349; Restatement of Agency (1933), § 329, Comment *a.*

█ Does this mean, however, that because the complaint asserts that young Stearns is liable as principal on the contract, he cannot be held to be liable in this action for breach of warranty of authority? The Court has found, as a matter of fact, that young Stearns purported to act on behalf of Stearns & Foster when, in fact, he had no such authority. The Court has found, as a matter of fact, that young Stearns authorized Everest Shipping Corporation to enter into the charter party with the plaintiff on behalf of Stearns & Foster, when he had no authority to do so. Young Stearns made a misrepresentation to Everest Shipping Corporation knowing that not only Everest Shipping Corporation would act thereon, but that other persons might be induced to act thereon, including the party whose ship was being chartered. In an action for fraud and deceit, recovery under such circumstances could be secured against young Stearns. Ultramares Corporation v. Touche, 1931, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139.

█ The plaintiff has asserted and has proved all facts necessary to establish a cause of action against young Stearns. Does the fact that the complaint states this cause of action as one for breach of contract rather than for breach of warranty of authority mean that recovery cannot be obtained against young Stearns? To so decide would elevate form above substance. A distinguished authority on the law stated a number of years ago that:

"It has often been pointed out that many of the difficulties and anomalies of English law are due to the tendency of the Anglo-American legal mind to think in terms of procedure. Further difficulties and anomalies are created by thinking in terms of names rather than realities. * * *" Bohlen, Misrepresentation as Deceit, Negligence, or Warranty, 42 Harv.L.Rev. 733 (1929).

The difference between an action for breach of warranty and one which would hold the agent as an undisclosed principal is a narrow one. Thus, in some jurisdictions, liability is based on the contract itself. Other jurisdictions, and the majority of them, hold that the agent is not liable on the contract but is liable for the breach of implied warranty of authority. See 3 C.J.S. Agency, § 208 and cases cited. In this case, the complaint may have been inartistically drawn, but the case was tried upon the theory that the plaintiff, having warranted his authority, was liable for the damages resulting therefrom as though he had been the principal to the contract. Rule of Civil Procedure 54(c), 28 U.S.C.A. provides, in part:

"Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

█ The Federal Rules have now done away with the narrow "theory of the pleadings" doctrine which would require

the pleader to state a definite theory of his case, on which theory he must win or fail. Under the Federal Rules, a party is not required to pick and stick to one theory, only to find that when he gets to trial that he has chosen the wrong one. Moore, Federal Practice (2d Ed., 1948), Vol. 2, par. 8.14; see Matarese v. Moore-McCormack Lines, 2 Cir., 1946, 158 F.2d 631, 170 A.L.R. 440; Nester v. Western Union Telegraph Co., D.C.S.D. Cal.1938, 25 F.Supp. 478.

The Court concludes that the plaintiff has established a cause of action against young Stearns for the damages suffered by the plaintiff.

4. A cause of action against Harry T. Randle, doing business as Harry T. Randle & Co., on the ground that Harry T. Randle & Co. falsely represented that it was authorized by Stearns & Foster to negotiate a charter on behalf of that Company, and that such representation was false and known to such defendant to be false at the time when it was made. The cause of action sounds in fraud and deceit, rather than for violation of an implied warranty of authority.

The facts as found by the Court establish that Harry T. Randle & Co. did purport to act as agent for Stearns & Foster, did negotiate the charter party on behalf of Stearns & Foster, and did deliver the counterpart of this charter party to the plaintiff. Not much dispute can exist as to those facts. Kiskaddon admitted that Randle & Co. acted as the broker for Stearns & Foster. Kiskaddon stated that he was skeptical of young Stearns' authority when he told him to "fix" the ship in the name of Stearns & Foster; that he did not think young Stearns had authority, but that he never questioned his authority. Kiskaddon admitted that it would have been a proper subject for him to investigate, but when asked why he did not investigate the question of authority, he replied: "No particular reason". Whether this action or inaction on his part was sufficient to establish an action for fraud and deceit might be open to some doubt.

Plaintiff contends, however, that it had a right to conform the pleading to the proof, and since the proof established a breach of implied warranty of authority, it was not necessary to establish actual fraud and deceit. At the end of the case, plaintiff moved, therefore, to conform the pleading to the proof by eliminating that part of the complaint which alleged that the representation of authority "was known to this defendant to be false and was made by him with intent to deceive plaintiff * * * when in fact defendant knew that Everest Shipping Corporation was not the agent of The Stearns & Foster, Inc. * * *" This motion to conform the pleading to the proof was granted.

No surprise could be claimed on the granting of this motion for under the pleading as filed, defendant had to be prepared to meet all the allegations of the complaint. If the plaintiff proved some, but not all, of the allegations of the complaint, and those that were proved were sufficient to establish liability, a cause of action was thereby established.

The facts as found by the Court establish the liability of Harry T. Randle & Co. for breach of implied warranty of authority. The facts showed that they were acting not as a middleman or intermediate negotiator between the parties but, in fact, representing one of the parties to the negotiation. As such, this defendant was an agent and must be held liable upon the implied warranty of authority. See 12 C.J.S., Brokers, §§ 1, 145; Restatement of the Law, Agency, § 329; see also Restatement of the Law, Agency, § 1, Comment d.

The Court concludes that the plaintiff has established a cause of action against Harry Thomas Randle, doing business as Harry T. Randle & Co., for the damages suffered by the plaintiff.

5. A cause of action against Francis V. Grauds, Harry Thomas Randle, doing business as Harry T. Randle & Co., and James E. Stearns on the

ground that these defendants conspired to induce the plaintiff to deliver its vessel to Everest Shipping Corporation under the false representation that plaintiff was entering into a charter party with the financially sound and responsible Stearns & Foster Company. As I have found this cause of action has not been established by the evidence submitted, this cause of action is dismissed.

It was stipulated by the parties that the determination of damages should await the decision of the Court on the issues of liability. This opinion, which shall constitute the findings of fact and conclusions of law of the Court, determines the issues of liability.

A conference will be held with all counsel present in my chambers at 4:30 P.M. on Tuesday, November 29, 1955 to determine whether the issues as to the amount of damages should be submitted to a Master and, if not, to fix a date for the trial of such issues.

On Issue of Damages

This cause was tried by the Court without a jury, pursuant to stipulation of all parties. The opinion of the Court on the issue of liability was handed down on November 17, 1955. It was stipulated by the parties that the determination of damages should await the decision of the Court on the issue of liability. A trial has now been held on the issue of damages.

The plaintiff makes a claim against those defendants, whose liability has been established, in the sum of $35,652.-99. Defendants dispute this amount and contend that no damages were proved.

As is shown in the previous opinion filed herein, the plaintiff chartered its ship, the "Akko", for a period of from three to five months. The party chartering the ship was stated in the charter party to be Stearns & Foster Company. The charter party was signed "Everest Shipping Corporation, as agents for Stearns & Foster Company, F. V. Grauds, President". The Court held that since Stearns & Foster had never authorized the execution of the charter

party or ratified or adopted it, that defendant was not liable. The Court held, however, that Everest Shipping Corporation, James E. Stearns, and Harry T. Randle, doing business as Harry T. Randle & Co., were liable on the basis of a breach of warranty of authority.

■ The first question which the Court must consider is the issue of law as to the proper measure of damages in a case of this nature where a defendant has been held liable for breach of warranty of authority in the execution of a charter party. It is well established that the liability is not merely for the harm caused to the person who has been misled, but also for the amount to which the plaintiff would have benefited had the authority existed. Restatement of the Law, Agency, § 329(j).

The issues in such a case were well framed in the opinion of the Court of Appeals of this Circuit in United Transp. Co. v. Berwind-White Coal-Mining Co., D.C., 13 F.2d 281, 282, as follows:

"(1) How much would the shipowner have made under the canceled charter if all had gone well; if no casualty had occurred, and no extraordinary expense been encountered?

"(2) How much did the charterer make under the substitute charter, the circumstances being what they actually were?" at page 283.

See also Ainesworth Coal & Iron Co. v. Trafikaktiedolaget Grangesberg Oxelosund, 4 Cir., 1923, 287 F. 291:

"The correct rule for estimating damages in this class of cases is that the shipowner is entitled to the net amount that would have been earned under the charter sued on, less the net amount actually earned, or which could with reasonable diligence have been earned during the time required in the voyage named in the charter." at page 296.

■ The action in a case of this nature is not one upon the charter party, but is one for the damages which ensue from the breach of warranty on the part

of the agent. This distinction is important for in such an action for breach of warranty, the plaintiff would be relieved from the necessity of showing performance of conditions precedent in the charter party. See White v. Madison, 1862, 26 N.Y. 117; Moore v. Maddock, 1929, 251 N.Y. 420, 167 N.E. 572, 64 A.L.R. 1189.

The Court finds the following facts:

When Stearns & Foster learned that their name had been placed upon the charter party without their approval, they refused to accept responsibility for the charter and thereupon the plaintiff became required to take over the further operation of the ship. At that time, the ship was in Brazil.

The plaintiff, in an effort to minimize its damages, therefore entered into a voyage charter for the transportation of iron ore from Victoria, Brazil, to Sidney, Nova Scotia, and another voyage charter for the transportation of gypsum from Dingwall, Nova Scotia, to Savannah, Georgia.

The first question considered by the Court is what the charterer made under the substitute charters. It was conceded that plaintiff received the first month's charter hire amounting to $26,892.50. It received voyage revenue from persons to whom it chartered the ship on voyage charters in the amount of $57,160.48 plus demurrage revenue of $1,002.09, or a total of $58,162.57. Thus the plaintiff received a total of $85,055.07.

However, in order to secure this revenue, certain expenses were paid by the plaintiff for which it has received no reimbursement.

The following expenses were conceded by the defendants to fall into this category:

| | | |
|---|---:|---:|
| Voyage expenses paid by the plaintiff in connection with the voyage charters as well as certain items paid for account of original charterer | | $21,555.16 |
| Crew overtime | | 200.00 |
| Bunker Fuel— | | |
| On hand at time of start of voyage | 3,377.92 | |
| Bought thereafter | 11,155.43 | |
| | 14,533.35 | |
| Less bunker fuel on hand at completion of voyage at Savannah, 1465 barrels @ $2.23 per barrel, plus barging of $240 | 3,506.95 | |
| | | 11,026.40 |
| Total expenses | | $32,781.56 |

Plaintiff has sought to include in its expenses four items paid by it which the Court finds are not properly to be included as expenses in determining its damages. They are:

(1) *$1,782.99—expenses in connection with labor difficulties* involved in the later voyage charters, for which amount plaintiff cannot be reimbursed for reasons hereinafter stated.

(2) *$1,088.48 paid by it as brokerage commissions* to defendants Randle and Everest and to Maritime Overseas Corporation on the first installment of the charter hire, which amounted to $26,892.50. Plaintiff received this charter hire and is giving credit for it to the defendants in computing its damages. If the original charter had been carried out, commissions would have been paid. Therefore, in this action—which is not a suit for return of commissions in which other issues might arise—the fact that the plaintiff paid brokerage

commissions on the charter hire actually received by it is not a basis for saying that it is entitled to add that sum to its expenses. This is particularly true since the expenses to be included, for the purpose of computing damages, are those which it had to expend to minimize its damages and which it would not have had to expend if the original charter had been performed.

■ (3) *The estimated cost of transporting the vessel from Savannah to a port north of Hatteras.* The plaintiff estimates this cost as follows:

| | |
|---|---|
| 2½ days hire | $2,241.05 |
| Port charge | 500.00 |
| Cost of fuel | |
| for such voyage | 809.49 |
| Total | $3,550.54 |

This claim is made on the ground that if the original charter had been carried out by Stearns & Foster, that charterer would have been required, under the terms of the charter, to redeliver the vessel at a port north of Hatteras. But the charter was not carried out by Stearns & Foster and the plaintiff therefore took possession of the vessel and put it on voyage charters to try to minimize its damages. The last of the voyage charters ended at Savannah. The plaintiff did not choose to send the ship to a port north of Hatteras, but instead the ship proceeded to Mobile for cargo, later returned to Savannah for more cargo, and eventually proceeded to Israel. Plaintiff obviously took this course because it thought it would be more profitable than returning the ship to a port north of Hatteras. There is no proper basis on which it can add to its damages an estimate for returning the ship to a port to which, for reasons of plaintiff's own choosing, it did not return.

■ (4) *Disbursements in the action against Stearns & Foster.* The plaintiff claims $906.99 for this item. While there might be a legal basis for a plaintiff, in circumstances like the present, including in its damages the cost of prosecuting an unsuccessful action against Stearns & Foster see White v. Madison, 26 N.Y. 117, 124, there was no competent proof that the item of $906.99 can be attributed solely to the action against Stearns & Foster. The plaintiff brought an action against five defendants. It was sustained on the issue of liability as to three of the defendants. It was not successful as to the other two. Its necessary and proper disbursements may be taxed as costs in the action. It is impossible from the proof submitted to state that the item of $906.-99 represents disbursements solely in the claim against Stearns & Foster as distinguished from the claim against all five named defendants. To allow this item might result in an award for damages being granted for an amount which in reality was, if chargeable at all, chargeable as disbursements in the action.

Thus the actual receipts by the plaintiff from the first month's charter and the substitute charters were $85,055.07, less $32,781.56, or $52,273.51.

We next have to consider how much the shipowner would have made under the canceled charter if all had gone well and if no casualty had occurred and no extraordinary expense been encountered. It was stipulated that if the original charter party had been carried out for its minimum period of three months, plaintiff would have been entitled to receive $80,677.50. The difference between this amount and the amount which it actually received net, after paying the expenses hereinabove referred to, is $28,403.99.

Defendants contend, however, that this sum should be further reduced on the ground all did not go well and casualties did occur and, therefore, if the original charter had been carried out, that the charterer would have been entitled to "off-hire" credits which would have reduced or eliminated the charter hire which it could have received from Stearns & Foster.

The credits claimed by the defendants are those resulting from (a) certain delays of the ship in leaving ports after the cargo was loaded, (b) certain

delays resulting from strikes or work stoppages of the crew, (c) delays due to breakdown of machinery, and (d) the failure of the ship to maintain throughout the voyages an average speed of 10.5 knots per hour.

It apparently is the position of the defendants that if Stearns & Foster had carried out the original charter, that firm would have been able to offset these items against the amount due under the charter, and that therefore plaintiff cannot contend that the full amount of the charter hire would have been obtained from Stearns & Foster.

The provisions of the original charter party upon which the defendants primarily rely are:

"8. The captain shall prosecute his voyages with the utmost dispatch * * *

* * * * * *

"15. That in the event of the loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

* * * * * *

"23. Vessel to work night and day, if required by Charterers * * *"

The defendants also contend that the full charter hire could not have been recovered from Stearns & Foster because the ship was warranted in the charter party as "capable of steaming, fully laden, under good weather conditions about 10½ knots on a consumption of about 26 tons best grade fuel oil", and the defendants state that, taking the total distance sailed by the ship, it did not sail at about 10½ knots.

The test as to what the charterer would have made under the cancelled charter is what it would have made if all had gone well, no casualty had occurred, and no extraordinary expense been encountered. United Trans. Co. v. Berwind-White Coal-Mining Co., supra. The words "if all had gone well" as used by Judge Hough in this opinion do not mean that ideal conditions would have prevailed throughout the entire charter period, but assume that the ship might have experienced the vicissitudes and delays to which a ship normally may be subjected. See S.S. Maria Strathatos, 1952 A.M.C. 347, at p. 354.

Using this test, we will now consider which of the credits claimed by the defendants are credits arising from circumstances which, if they had existed while the original charter was being performed, would have resulted in credits to the charterer and, therefore, a diminution of the amount that the plaintiff would have received.

It must be remembered that there has been no proof that the companies which took voyage charters for the later voyages claimed any credit against the charter hire by reason of the matters raised by the defendants, nor has there been any proof that the plaintiff would have received greater charter hire from them if these circumstances had not occurred. However, the voyage charters were not before the Court, and there is, therefore, no way of knowing the terms under which the ship was chartered for those voyages.

By reason of this, it is necessary to consider the facts which the defendants claim would have entitled them to credits. These credits fall in to four categories:

(a) *Delays of the ship in leaving ports after the cargo was loaded.* The defendants claim three delays:

1. They claim that there was a delay of 14 hours, 35 minutes, in the period of June 11—June 12, 1953. This was in the period prior to the time that Stearns & Foster had repudiated the charter and during a time when the defendant Everest was acting as agent for Stearns & Foster. No claim for any credit due to that delay was made. As a matter of fact, from the testimony presented at the trial, the Court concludes the delay was not unreasonable or such as would have entitled the charterer to a credit.

2. The defendants claim that the vessel was delayed at Victoria on July 27. The evidence does not indicate that the delay of some 6 hours was unreasonable. The evidence would indicate that a period of 6 hours between the completion of loading and the actual sailing is not an unreasonable delay.

3. The defendants claim that the vessel was delayed at Dingwall on August 30 because the crew was permitted rest time from 6:30 A.M. on August 30 to 1:00 P.M. of that day, and from 7:30 that evening to 6:00 A.M. on the following day. The Court does not believe that the master's decision to allow the crew this rest period when it had been busily engaged in the loading of the ship was a violation of any obligation to use due diligence in the operation of the vessel. There is no indication that the party which had voyage chartered the vessel thought so either.

 (b) *Delays resulting from strikes or work stoppages of the crew.* The defendants contend that the vessel was delayed for over six days at Rio de Janeiro and over four days at Sidney by reason of work stoppages of the crew. Certain of the time lost at Rio had nothing to do with the work stoppage but was the result of the refusal of Stearns & Foster to recognize the charter and the failure of the defendant Everest to forward dispatch monies concededly due to the consignee under the terms of the coal charter which had been arranged between Everest and the consignee.

The Court finds as a fact that the time lost at Rio by reason of the strike was from 12:00 noon on July 20 to 14:00 o'clock July 23, a period of 2 days and 14 hours. The Court finds as a fact that the time lost at Sidney by reason of the strike was from 6:00 o'clock on August 25 to 9:39 on August 29, a period of 4 days, 3 hours, 39 minutes.

The Court concludes that if similar inexcusable work stoppages had occurred under the original charter, the charterer would have had a claim for off-hire during that period. The Court is of the opinion that the evidence is sufficient to indicate that if this casualty had occurred—and there is no reason to believe it would not have occurred if Stearns & Foster had been the charterer—the amount which would have been received from Stearns & Foster would have been reduced. Such a strike is a casualty which resulted in a "shortage of men" within the terms of the charter party for which a charterer would have been entitled to a reduction of charter hire. See The Canadia, 3 Cir., 1917, 241 F. 233. The amount of reduction would have been $6,031.77, representing six days' and 17½ hours' charter hire at $896.42 per day and $450.05 for fuel consumed during this period which was fixed at 30 barrels a day.

For the same reason, the expense of $1,782.99 in connection with labor difficulties has been disallowed.

 (c) *Delays due to breakdown in machinery.* The Court finds that the ship was delayed for a total of 2 days, 20 minutes, by reason of boiler breakdowns on August 15, 16 and 17. This again was a casualty which, under the terms of the original charter party, would have entitled Stearns & Foster to an off-hire credit. There is no reason to believe that the casualty would not have occurred if Stearns & Foster had been the charterer. The Court therefore concludes that the plaintiff would not have been able to receive $1,805.29 charter hire representing this period or $134.73 for fuel consumed during this period.

 (d) *Failure of the ship to maintain throughout the voyage an average speed of 10.5 knots per hour.* The rep-

resentation in the charter party that the ship was capable of steaming at this rate was not a representation or warranty that the ship on every voyage would average 10½ knots. It was a representation or warranty that in good weather conditions, it was capable of sailing at that rate. The evidence shows, and the Court concludes as a matter of fact, that Stearns & Foster would not have had an off-set or counterclaim by reason of this representation in the charter party. The evidence shows that the ship was capable of sailing at the rate of 10½ knots on a fuel consumption of about 26 tons of fuel oil. The defendant Everest acted as agent for the vessel for about a month, but never raised any question about the speed of the ship, although this defendant now contends that the voyage actually took 8 days, 3½ hours when it should have taken 7½ days.

The defendants, in support of their position, merely took the theoretical distances which might be traveled by a ship following a straight line and disregarded the actual distance traveled by the vessel. Thus, in making their computation, they used distances from the Table of Distances of 12,082 miles rather than the actual distance traveled by the vessel which, according to the log book, was 12,334 miles. The log shows that the average speed of the vessel on many days was 10.4 knots. On some occasions, it was over that speed and on other occasions it was under that speed. On many of the occasions when it was substantially under that speed, the log showed poor weather conditions. The log, of course, showed the "screw speed" which appears to be the speed at which the ship would travel in a calm sea. The log also discloses that the vessel never consumed more than 175 barrels of fuel oil on any one day except on one day. The Court finds as a fact that the charterer would not have been entitled to any credit or off-set growing out of such warranty or representation contained in the original charter party.

Deducting the allowed off-hire credits from the amount which it has been stipulated would have been the total charter hire payable by Stearns & Foster if all had gone well and no casualties had occurred, we get the following:

| | |
|---|---|
| Stipulated amount | $80,677.50 |
| Less credits for off-hire | 8,421.84 |
| | $72,255.66 |

As has heretofore been shown, plaintiff actually received from the first month's charter hire and substitute charters, after payment of expenses, the sum of $52,273.51.

The Court finds that the difference of $19,982.15 represents the damages actually sustained by the plaintiff.

The Court concludes that the plaintiff is entitled to judgment against the defendants Everest Shipping Corporation, James E. Stearns, and Harry Thomas Randle, doing business as Harry T. Randle & Co., jointly and severally, for the sum of $19,998.15 together with interest thereon from September 12, 1953.

Judgment to be entered accordingly.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Should any party desire enumerated or additional findings, these may be proposed upon notice to the other side.